UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
DUSTIN MARK MACOLOR,

      Plaintiff,      14 Civ. 4555 (JMF) (RLE)

  -vs-

RHANDY R. LIBIRAN, AMERICAN MANPOWER
RESOURCE PROVIDER INC., MICHAEL URBINO,
AXIS POINT ALTERNATIVE SOLUTIONS, INC.,
and AMERICAN HEALTHCARE FACILITY
MANAGEMENT GROUP, INC.,

      Defendants.
------------------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR AN AWARD OF DAMAGES AGAINST THE DEFAULTED DEFENDANTS

  Plaintiff Dustin Mark Macolor submits this Memorandum of Law in support of his motion, pursuant to Fed. R. Civ. P. 55(b)(2)(B), for an award of damages, jointly and severally, against defendants Rhandy R. Libiran, American Manpower Resources Provider Inc., Axis Point Alternative Solutions, Inc., and American Healthcare Facility Management Group, Inc.

### Preliminary Statement

  Defendants recruited plaintiff in the Philippines and induced him to travel to the United States with false promises that they would employ him full time at $31.15 per hour. Complaint ¶ 2.[1] After plaintiff traveled to the United States at his own expense, defendants required plaintiff to work as a "volunteer" without any compensation. *Id.* For four months, defendants refused to pay plaintiff the agreed upon rate of $31.15 per hour for full-time work. *Id.*

---

[1] The complaint in this action is annexed to the Declaration of John Howley as Exhibit 3.

When plaintiff told the defendants that he needed to find a paying job, the defendants threatened to sue him for $20,000 in so-called "liquidated damages" if he went to work for anyone else. *Id.* ¶ 3. At the time the defendants made these threats, they knew that the so-called $20,000 in "liquidated damages" was actually an illegal and unenforceable penalty. *Id.* ¶ 4. The defendants also knew that plaintiff had little or no money, and had no ability to pay for food and shelter other than working as a physical therapist. *Id.* ¶ 56. Under these circumstances, plaintiff reasonably feared serious financial and reputational harm if he did not continue working for defendants. *Id.*

The individual defendant, Rhandy R. Libiran, carried out this foreign labor recruiting scheme through multiple corporate entities he owns and controls, including defendants American Manpower Resource Provider Inc., Axis Point Alternative Solutions, Inc., and American Healthcare Facility Management Group, Inc. *Id.* ¶ 5. Disregarding corporate forms and formalities, Mr. Libiran dominated and controlled the corporate defendants in an illegal scheme to place plaintiff in a state of indentured servitude, keep him in a state of fear, and cheat him out of his compensation. *Id.* ¶ 6.

U.S. District Judge Jesse M. Furman entered a default against Mr. Libiran and three of his corporations after Mr. Libiran knowingly and willfully failed to appear for the scheduled trial in this action. Judge Furman has referred this case to Magistrate Judge Ronald L. Ellis for an inquest on the amount of damages plaintiff may recover.

For the reasons set forth below, plaintiff requests a judgment against Mr. Libiran and his three corporations, jointly and severally, for $17,705.55 in compensatory damages, $22,705.55 in punitive damages, together with $58,251.96 in attorney's fees and $3,351.96 in costs.

## Procedural History

This action was commenced on June 24, 2014. Howley Declaration, Exhibit 2. On July 30, 2014, the Clerk entered a Certificate of Default against the corporate defendants because they failed to respond to the complaint. *Id.* The next day, U.S. District Judge Jesse M. Furman entered an order to show cause directing the corporate defendants to file opposition papers by August 20, 2014, and setting a hearing on the motion for August 27, 2014. *Id.*

The defendants never filed opposition papers. Instead, after the motion was fully briefed by plaintiff, the defendants avoided a default judgment by filing an answer on the return date, August 27, 2014. *Id.*

Over the next 13 months, the defendants failed to comply with almost every deadline and obligation under the Federal Rules of Civil Procedure and the Court's scheduling orders. On October 21, 2014, Judge Furman ordered defendants' attorney to pay $2,000 in sanctions for failing to appear at the initial pretrial conference. *Id.* On January 23, 2015, Judge Furman ordered defendants' attorney to pay $4,000 in sanctions for failing to appear at the rescheduled pretrial conference. *Id.* On March 18, 2015, Judge Furman ordered defendants' attorney to pay $6,000 in sanctions for failure to comply with Court orders. *Id.* On March 19, 2015, Judge Furman entered an order imposing discovery sanctions, pursuant to Fed. R. Civ. P. 37, precluding the defendants from relying on testimony of witnesses who were not identified and documents that were not produced during discovery. *Id.*

On April 29, 2015, after the parties completed all pretrial submissions, Judge Furman scheduled a final pretrial conference for May 26, 2015, and ordered the parties to

3

be ready for trial at 9:00 a.m. on June 1, 2015. *Id.* A few days after the final pretrial conference and trial date were scheduled, defendant Rhandy Libiran filed a Chapter 7 petition in the U.S. Bankruptcy Court for the Southern District of New York. *Id.* As a result of the bankruptcy filing, Judge Furman placed the action on the suspense calendar. *Id.*

Plaintiff moved for relief from the automatic stay in the Bankruptcy Court. Howley Declr., Exh. 5. Plaintiff also filed an adversary proceeding in Bankruptcy Court alleging that his claims in this action are not dischargeable pursuant to Bankruptcy Code §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6), because, *inter alia*, they seek to recover money owed to plaintiff for services obtained by false pretenses, a false representation or actual fraud. Howley Declr., Exh. 6. Plaintiff alleged that Mr. Libiran should be denied a discharge of all claims pursuant to Bankruptcy Code §§ 727(a)(2), 727(a)(3), and 727(a)(4), because he failed to disclose all of his income and assets to the Bankruptcy Court. *Id.*

On July 28, 2015, after the Bankruptcy Court granted relief from the automatic stay, Judge Furman reopened the case, scheduled a final pretrial conference for September 10, 2015, and scheduled a jury trial to commence on September 16, 2015. Howley Declr., Exh. 2.

Plaintiff entered into a settlement agreement with defendant Michael Urbino before trial. *Id.* Under the terms of the agreement, Mr. Urbino agreed to pay $5,000.00 to settle claims that he violated the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.*, by failing to pay plaintiff the minimum wage for all hours worked. *Id.*

Defendant Rhandy Libiran and the three corporate defendants chose not to appear for trial. Howley Declr., Exh. 7. The day before trial was scheduled to begin, Mr. Libiran's attorney revealed that Mr. Libiran and the corporate defendants "would not be present at the scheduled trial date . . . and that they would be defaulting in this action." *Id.* ¶ 2. Mr. Libiran's lawyer told Judge Furman that he "warned [Mr. Libiran] of the consequences of his and the corporations being in default." *Id.* ¶ 3. According to his lawyer, Mr. Libiran "was definite about his not coming back to New York for the trial and he knew the consequences thereof." *Id.*

After hearing from Mr. Libiran's attorney, Judge Furman entered a default against Mr. Libiran and the three corporate defendants. Howley Declr., Exh. 2. The default was entered on the issue of liability for violations of the Trafficking Victims Protection Act (TVPA), 18 U.S.C. § 1589 *et seq.*, the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201, *et seq.*, fraud and breach of contract. *Id.*

On September 16, 2015, Judge Furman entered an order referring this matter to U.S. Magistrate Judge Ronald L. Ellis for an inquest on damages. *Id.*

## Statement of Facts

In October 2012, plaintiff attended a seminar entitled "Work in America: Learn the Success Formula (PT Version)" at a shopping mall in Manila, Philippines. Complaint ¶ 16. While attending the seminar, plaintiff met defendants Rhandy Libiran and Michael Urbino. *Id.* Defendants Libiran and Urbino had organized the seminar to recruit physical therapists to work for their companies in New York. *Id.*

A few days after the seminar, Mr. Urbino, identifying himself as President and CEO of defendant American Healthcare, sent a follow-up email to plaintiff in the

Philippines. *Id.* ¶ 17. Mr. Urbino encouraged plaintiff to "pursue to work in the United States." *Id.* ¶ 18. He told plaintiff that there was "significant" demand for physical therapists in the United States and that plaintiff would be "rewarded aptly [sic]" if he chose to pursue his "dream career" in this country with defendant American Healthcare. *Id.*

In November 2012, Liza Fagarita sent a series of follow-up emails to plaintiff in the Philippines. *Id.* ¶ 19. Ms. Fagarita identified herself as "a Healthcare Recruiter for American Healthcare Facility Management Group, Inc." and used an American Healthcare email address. *Id.* Ms. Fagarita told plaintiff that he could begin working immediately as a physical therapist in the United States. *Id.* ¶ 20.

Ms. Fagarita, still identifying herself as an employee of defendant American Healthcare and still using an American Healthcare email address, sent plaintiff the defendants' standard employment contract. Complaint ¶ 21. The contract listed the employer as defendant American Manpower. *Id.* Ms. Fagarita referred to the document as "our contract" and "our Employment Contract." *Id.*

The proposed employment contract required that the employee pay "liquidated damages" of $20,000 in the event the employee was terminated for cause, breached the contract, or left the defendants' employ before the end of the contract term. *Id.* ¶ 22. Ms. Fagarita explained that this payment was designed to reimburse the employer for legal fees and other costs related to providing immigration assistance to non-immigrant employees who required visas and other working papers. *Id.* The payment was also designed to reimburse the employer for the employee's travel and housing expenses. *Id.*

6

In their November 2012 email exchanges, Ms. Fagarita and plaintiff agreed that plaintiff did not require any immigration, housing, or travel assistance. *Id.* ¶ 23. On November 27, 2012, Ms. Fagarita acknowledged in an email to plaintiff that the defendants "will be exerting no expenses for your immigration status" and that the defendants "won't be paying for your housing accommodation during your stay in the US." *Id.* ¶ 24.

In September 2013, defendant Rhandy Libiran traveled to the Philippines for purposes of recruiting physical therapists to work for the defendants in New York. *Id.* ¶ 28. He met with plaintiff in the Philippines on or about September 4, 2013. *Id.* ¶ 30. After their meeting in the Philippines, plaintiff agreed to sign an employment contract to work for the defendants in New York. *Id.* ¶ 31.

The Contract referred to defendant American Manpower as the "employer" and to plaintiff as the "employee." *Id.* ¶ 32. It provided that defendant American Manpower would employ plaintiff at $31.15 per hour as a full-time physical therapist for 6,240 hours. *Id.* Defendant American Manpower also agreed to pay sick leave of up to 3 days per year, holiday pay for 6 mandatory holidays per year, medical and dental benefits, and malpractice insurance. *Id.* The Contract states that it "shall be governed by and construed in accordance with the laws of the State of New York." Complaint ¶ 34.

Between November 6, 2013 and November 7, 2013, defendant Libiran sent several emails to plaintiff in the Philippines. *Id.* ¶ 35. Mr. Libiran assured plaintiff that he would be employed at "one of our facility [sic] in Long Island" immediately upon plaintiff's arrival in New York. *Id.*

### A. Defendants Required Plaintiff to Work for Free

Plaintiff arrived in New York on Friday, November 29, 2013. Complaint ¶ 36. The defendants picked up plaintiff at JFK International Airport and brought him directly to their offices. *Id.* Immediately after plaintiff's arrival in New York, defendants directed him to work as a "volunteer" at the Dynamic Physical Therapy clinic in Jamaica, Queens. *Id.* ¶ 37. Plaintiff worked at the Dynamic Physical Therapy clinic for 40 hours. *Id.* Defendants did not pay plaintiff any compensation for this work. *Id.*

Between December 1, 2013 and March 30, 2014, defendants did not pay plaintiff the contractually agreed compensation rate of $31.15 per hour. *Id.* ¶ 39. Defendants paid plaintiff only $1,093 for four months, or $273 per month. *Id.* ¶ 40. After taxes, plaintiff received net compensation of only $892 for four months, or $223 per month. *Id.*

Defendants paid plaintiff with paychecks that listed the phone number of American Manpower as (201) 683-5611. *Id.* ¶ 41. That is the phone number of a different corporation, Adriland Institute Inc., which is also owned and controlled by defendants Libiran and Urbino. *Id.*

### B. The Defendants Threatened Plaintiff with Serious Financial Harm

Between December 1, 2013 and March 30, 2014, defendants repeatedly reminded plaintiff that he must work exclusively for them, and that they would sue him for $20,000 in so-called liquidated damages if he attempted to work for anyone else. Complaint ¶ 42. At the time these threats were made, plaintiff had little or no money, and had no ability to pay for food and shelter other than working as a physical therapist. *Id.* ¶ 56. Under these circumstances, plaintiff reasonably feared serious financial and reputational harm if he did not continue working for defendants. *Id.*

8

In February and March 2014, Plaintiff told the defendants that he could not survive in New York on $223 per month. *Id.* ¶ 44. He asked them to pay him the agreed-upon rate of $31.15 per hour for full-time work. *Id.*

On April 2, 2014, Mr. Urbino admitted that the defendants were unable or unwilling to perform their contractual obligations. *Id.* ¶ 45. Mr. Urbino told plaintiff that the only work they had lined up for him was for one day at a clinic in the Bronx and for three days at a clinic in Rockaway. *Id.* ¶ 46. Mr. Urbino used his Axis Point email to send this message to plaintiff. *Id.*

After receiving no assurances from the defendants, plaintiff told Mr. Libiran and Mr. Urbino that he had to seek employment elsewhere. *Id.* ¶ 48. Mr. Libiran and Mr. Urbino once again threatened to sue plaintiff for $20,000 in so-called "liquidated damages" if he sought other employment. *Id.*

Faced with the very real prospect that he would have no money to pay for basic necessities such as food and a place to live, plaintiff sought and obtained work with a different employer. *Id.* ¶ 49. Mr. Libiran immediately hired a collection agency that began sending letters to plaintiff and calling him at home demanding payment of $27,729.67. *Id.* ¶ 50. The collection agency's letters stated that the amount due was comprised of $20,000 in principal, $6,666.66 in collection fees, and $1,063.01 in interest. *Id.*

## Argument

### Point I

### PLAINTIFF IS ENTITLED TO $17,705.55 IN COMPENSATORY DAMAGES FOR VIOLATIONS OF THE TRAFFICKING VICTIMS PROTECTION ACT (TVPA), COMMON LAW FRAUD, AND BREACH OF CONTRACT

Plaintiff seeks damages for violations of the Trafficking Victims Protection Act (TVPA), 18 U.S.C. § 1589 *et seq.*, common law fraud, and breach of contract.[2]

The TVPA creates a private right of action for damages on behalf of persons who are held in a condition of servitude by means of non-violent coercion, including threatened psychological, financial and reputational harm. *See* 18 U.S.C. §§ 1589, 1590, 1594(a), and 1594(b). Defendants are liable for damages under the statute if they engaged in prohibited conduct, or if they knowingly benefited, financially or by receiving something of value, from participation in a venture which they knew or should have known has engaged in such conduct. *See* 18 U.S.C. § 1589(b).

In this case, plaintiff seeks compensatory damages under the TVPA for the compensation he would have received – either from the defendants or from another employer – but for the defendants' use of threats of financial harm to keep him working for them without compensation. Plaintiff seeks the same type of compensatory damages for his claims of common law fraud and breach of contract.

The amount of compensation plaintiff should have been paid under his employment contract with the defendants provides a legitimate and easily calculable measure of damages. Under the contract, the defendants were required to pay plaintiff

---

[2] Plaintiff also seeks damages for the defendant's failure to pay him the minimum wage in violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.* Those damages, however, are subsumed with in the damages sought on plaintiff's other claims.

10

$31.15 per hour for full-time work. If the defendants had paid plaintiff at that hourly rate for 40 hours per week over the course of the four months that plaintiff worked for them, then the defendants would have paid plaintiff total compensation of $21,182.00.[3]

In fact, the defendants paid plaintiff only $1,093.05 for the four months he worked for them. Subtracting the amount actually paid from the amount that should have been paid results in an underpayment of $20,088.95. *See* Howley Declr. ¶ 4.

Plaintiff was also entitled to paid sick leave and holidays. The pro rata value of paid sick leave and holidays for four months of employment is $2,616.60. *Id.* Adding that amount to the compensation underpayment results in a total underpayment of $22,705.55. Subtracting the amount of defendant Michael Urbino's settlement from this total loss results in a net underpayment of $17,705.55. *Id.*

Plaintiff, therefore, requests an award of $17,705.55 in damages to compensate him for the income he would have received but for the defendants' violations of the TVPA, fraud, and breach of contract. He also requests prejudgment interest at the rate of 9% per annum from March 30, 2014, pursuant to Rules 5001 and 5004 of the New York Civil Practice Law and Rules.

## Point II

### PLAINTIFF IS ENTITLED TO $22,705.55 IN PUNITIVE DAMAGES FOR VIOLATIONS OF THE TRAFFICKING VICTIMS PROTECTION ACT (TVPA) AND COMMON LAW FRAUD

Punitive damages are available under the TVPA. *See Ditullio v. Boehm*, 662 F.3d 1091, 1096-99 (9th Cir. 2011). Punitive damages are also available for fraud under New

---

[3] To calculate plaintiff's expected compensation for the four months he worked for defendants, we multiplied 17 weeks times 40 hours per week to arrive at 680 total hours. Multiplying 680 hours by $31.15 per hour results in total compensation of $21,182.00. See Howley Declr. ¶ 4.

York common law. *See Borkowski v. Borkowski*, 39 N.Y.2d 982, 387 N.Y.S.2d 233 (1976); *see also Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1118 (2d Cir.1986). Moreover, a court may award punitive damages after a default judgment without an evidentiary hearing if there is a basis to do so from the established facts or the evidence submitted by the moving party. *See, e.g., Action, S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 509 (2d Cir. 1991) (affirming award of $500,000 in punitive damages without a full evidentiary hearing).

In this case, the facts alleged in the complaint and deemed admitted by the defendants' default are sufficient to support an award of punitive damages. The defendants here induced plaintiff to leave his home country of the Philippines with promises of immediate employment as a physical therapist. They used corporate entities with names such as "American Healthcare Facility Management Group, Inc.," and they spoke in terms of placing plaintiff immediately in one of "their" facilities, to give plaintiff the impression that the defendants ran a substantial business. In fact, the defendants had no work for plaintiff.

Those facts alone are sufficient to establish that the defendants fraudulently induced plaintiff to leave his home country and come to work for them on the other side of the world. But the defendants went one step further and tried to extort either work or cash out of the plaintiff, first by threatening to sue him for a $20,000 penalty to prevent him from working for anyone else, and then by attempting to collect $27,729.67 in "liquidated damages" when they had actually expended nothing on his behalf and gave him nothing in return for his "exclusive contract."

The defendants' actions went far beyond a mere breach of contract or even false promises. They knowingly and intentionally used the threat of a lawsuit and collection efforts to extort money and/or labor out of plaintiff.

Plaintiff submits that an award of punitive damages is, therefore, appropriate in this case. Plaintiff also submits that the liquidated damages provisions for intentional failure to pay wages under the Fair Labor Standards Act provides, by analogy, an appropriate measure for punitive damages in this case. *See* 29 U.S.C. § 216 (providing for "the payment of wages lost and an additional equal amount as liquidated damages").

Accordingly, plaintiff requests an award of $22,705.55 in punitive damages, which is equal to the amount of compensation defendants knowingly and intentionally failed to pay him.

### Point III

### PLAINTIFF IS ENTITLED TO $58,251.96 IN ATTORNEYS' FEES AND $3,351.96 IN COSTS AS PROVIDED FOR IN THE TRAFFICKING VICTIMS PROTECTION ACT (TVPA) AND THE FAIR LABOR STANDARDS ACT

The Trafficking Victims Protection Act and the Fair Labor Standards Act provide for an award of reasonable attorney's fees and costs to a prevailing plaintiff. See 18 U.S.C. § 1595(a) and 29 U.S.C. § 216(b). An attorney's reasonable fee is calculated by multiplying an attorney's reasonable hourly rate by the number of hours reasonably expended on the matter. *See, e.g., Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 166-67 (2d Cir. 2011).

Plaintiff's attorney has more than 25 years of experience litigating employment cases, including a number of cases under the Trafficking Victims Protection Act (TVPA). For almost 20 years, he practiced at Kaye Scholer LLP, including for more than ten years

13

as a partner in the firm's litigation and labor departments and as chairman of the firm's pro bono committee. Among his significant cases, plaintiff's attorney represented the plaintiffs in *McReynolds v. Sodexho*, a race discrimination class action that settled for $80 million; he represented the defendants in *Roberts v. Texaco*, a race discrimination class action that settled for $115 million; and he represented the New York City Patrolmen's Benevolent Association in a labor arbitration that resulted in an award granting police officers higher compensation increases than firefighters for the first time in 100 years. He has argued numerous appeals in the U.S. Court of Appeals for the Second Circuit. He also argued an appeal in the U.S. Supreme Court on behalf of the Governments of India and Mongolia in *Permanent Mission of India to the United Nations v. City of New York*.

Plaintiff submits that his attorney's usual rate of $500 per hour is reasonable for a lawyer with this level of experience. *See, e.g., Antonmarchi v. Consol. Edison Co. of N.Y., Inc.*, No. 03 Civ. 7735 (LTS) (KNF) (2012 WL 3126004, at *2 (S.D.N.Y. July 31, 2012) (rate of $530 per hour was reasonable for a lawyer with 30 years of experience and $400 per hour was reasonable for a lawyer with 15 years of experience).

Plaintiff also submits that the detailed time records submitted by his attorney establish that the hours worked on this matter were reasonable. *See* Howley Declr., Exh. 2. While the number of hours were increased due to the defendants' dilatory and obstructionist conduct, the entries show that the plaintiff's attorney worked efficiently on each of the tasks he performed in this lawsuit. *See id.*

Under these circumstances, plaintiff submits that his attorney's usual rate of $500.00 per hour and the time charges detailed in his accompanying affidavit are reasonable.

## Conclusion

For all the foregoing reasons, plaintiff Dustin Mark Macolor requests judgment against defendants Rhandy Libiran, American Manpower Resources Provider Inc., Axis Point Alternative Solutions, Inc., and American Healthcare Facility Management Group, Inc., jointly and severally, awarding plaintiff the following damages, attorneys' fees, and costs:

a. compensatory damages in the amount of $17,705.55 (calculated as $22,705.55 less $5,000.00 already paid by defendant Michael Urbino pursuant to his settlement agreement) for violations of the TVPA, common law fraud, and breach of contract;

b. prejudgment interest at the rate of 9% per annum on the compensatory damages of $17,705.55 from March 30, 2014, pursuant to Rules 5001 and 5004 of the New York Civil Practice Law and Rules;

c. punitive damages in the amount of $22,705.55 for violations of the TVPA and common law fraud;

d. attorneys' fees of $58,251.96 and costs of $3,351.96 as authorized by 18 U.S.C. § 1595(a) and 29 U.S.C. § 216(b); and

e. granting such other and further relief as this Court deems just and proper.

Dated: New York, New York
October 5, 2015

JOHN HOWLEY, ESQ.

By: _____
John Howley [JH9764]
*Attorney for Plaintiff*
350 Fifth Avenue, 59th Floor
New York, New York 10118
(212) 601-2728