UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------
DUSTIN MACOLOR,

              Plaintiff,

     - against -

RHANDY R. LIBIRAN, et al.,

             Defendants.
------------------------------------------------------------

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/25/16

REPORT AND
RECOMMENDATION

14-CV-4555 (JMF) (RLE)

**TO THE HONORABLE JESSE M. FURMAN, U.S.D.J.:**

## I. INTRODUCTION

On June 24, 2014, Plaintiff Dustin Macolor ("Macolor") brought this action against Rhandy R. Libiran ("Libiran"), Michael Urbino ("Urbino")[1], American Manpower Resources Provider, Inc. ("American Manpower"), Axis Point Alternative Solutions, Inc. ("Axis Point"), and American Healthcare Facility Management Group, Inc. ("American Healthcare," and, collectively, "Defendants"), for damages arising under the Trafficking Victims Protection Act (TVPA), 18 U.S.C. §§ 1589 *et seq.*, the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201 *et seq.*, the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692, New York State Labor Law §§ 650 *et seq.*, and the common law for breach of contract, fraud, unjust enrichment, and *quantum meruit*. On September 16, 2015, after Libiran's willful failure to appear at trial, the Court entered a default on consent against Libiran and the corporate Defendants. (Doc. No. 74.) That same day, the Honorable Jesse M. Furman referred the case to the undersigned for an inquest on damages. (Doc. No. 75.) For the reasons that follow, I recommend that judgment be

---

[1] On September 15, 2015, Plaintiff reached a settlement agreement with Defendant Urbino, and the case against him was voluntarily dismissed. (Doc. No. 73, 74.)

entered for Macolor in the amount of **$15,088.95 in damages and $58,251.96 in attorneys' fees and costs, and $2,756.75[2] in prejudgment interest, for a total of $76,097.66.**

## II. BACKGROUND

This claim arises from Macolor's allegation that, in the Philippines, Defendants recruited and induced him to travel to the United States with false promises that they would employ him full-time at $31.15 per hour. (Compl. ¶ 2.) After Macolor traveled to this country at his own expense, he alleges that Defendants required him to work as a "volunteer" without any compensation, then failed to give him full-time work. (*Id.*) When Macolor told the Defendants that he needed to find alternative work to support himself, Defendants attempted to prevent him from leaving their employ by threatening to bring a lawsuit against him for $20,000, under a "liquidated damages" clause of his employment contract, eventually retaining a collection agency that demanded that money from Macolor, plus fees and interest. (Compl. ¶ 3.)

### A.      Facts Alleged in the Complaint

When a court determines that a defendant is in default, the factual allegations of the complaint, except those relating to the amount of damages, must be taken as true. *Li Ping Fu v. Pop Art Int'l Inc.*, No. 10-CV-8562 (DLC)(AJP), 2011 WL 4552436, at *1 (S.D.N.Y. Sept. 19, 2011). Macolor alleges the following facts in his Complaint:

Libiran is the President of both American Manpower and American Healthcare, and the Vice-President of Axis Point. (Compl. ¶ 10.) Urbino is the Chief Executive Officer of American Healthcare and the President of Axis Point. (*Id.* at ¶ 12.) American Manpower is a New York corporation, and American Healthcare and Axis Point are both New Jersey corporations that regularly do business in the State of New York. (*Id.* at ¶ 11-14.)

---

[2] Calculated to April 11, 2016.

Macolor is a physical therapist from the Philippines. (*Id.* at ¶ 9, 16.) He first met Libiran and Urbino in October 2012, when he attended a recruiting seminar that Libiran and Urbino had organized at a shopping mall in Manila, entitled "Work in America: Learn the Success Formula (PT Version)." (*Id.* at ¶ 16.) After the seminar, Macolor exchanged emails with Urbino and with an employee of American Healthcare named Liza Fragarita ("Fragarita"), both of whom tried to recruit Macolor to come to the United States to work as a physical therapist for American Healthcare. (*Id.* at ¶ 19-20.) Over the course of the next several months, Macolor and Fragarita exchanged emails about the terms of Macolor's prospective employment in the United States. (*Id.* at ¶ 21-26.) Macolor and Fragarita agreed that Macolor would not require assistance with immigration, travel from the Philippines, or housing once he arrived, and that Macolor would bear his own expenses. (*Id.* at ¶ 23-24.) Macolor signed an employment contract that Fragarita provided in December 2012. (*Id.* at ¶ 26.)

In the following months, Macolor exchanged emails with Urbino, in which Urbino explained the process of applying for a physical therapist license in New York State and promised Macolor that Defendants would "provide [Macolor] with the job as soon as [he] pass[ed] the exam and a license [was] awarded by the State." (*Id.* at ¶ 27.) In September 2013, Libiran arranged by email to meet with Macolor during a visit to the Philippines regarding his "application" for a "Physical Therapy position here in New York." (*Id.* at ¶ 29.) After that meeting, Macolor and Libiran agreed that Macolor would work for American Manpower in New York, and they signed a new employment contract. (*Id.* at ¶ 31-32.) That contract, effective September 24, 2013, provided that American Manpower would pay Macolor $31.15 per hour as a full-time physical therapist for 6,240 hours of work. (*Id.* at ¶ 32.) The contract also provided that American Manpower would pay: (1) sick leave up to three days per year; (2) holiday pay for

3

six holidays per year; (3) medical and dental benefits; and (4) malpractice insurance. (*Id.*) The contract contained a "conflicting employment" term that prohibited Macolor from accepting employment from "any other entity" without the written authorization of American Manpower. (*Id.* at ¶ 32.) In addition, the contract contained a "liquidated damages" provision that required Macolor to pay damages of $20,000 if he was terminated for cause, breached any of the provisions of the contract, or stopped working at American Manpower. (*Id.* at ¶ 33.) The contract was to be governed by the laws of the State of New York. (*Id.* at ¶ 34.)

After signing this contract, Libiran sent several more emails to Macolor assuring him that he would be employed at "one of our facility [sic] in Long Island" immediately upon Macolor's arrival in New York. (*Id.* at ¶ 35.) Macolor arrived in New York on November 29, 2013, where he was met by Libiran and Urbino at the airport and brought directly to their offices. (*Id.* at ¶ 36.) Contrary to Libiran's earlier promises, and the terms of the employment contract, Libiran and Urbino directed Macolor to report to work as a "volunteer" at the Dynamic Physical Therapy Clinic in Jamaica, Queens, where Macolor worked without compensation for forty hours. (*Id.* at ¶ 37.) Subsequently, Defendants failed to provide Macolor with the full-time employment he was promised. (*Id.* at ¶ 38.) Between December 1, 2013, and March 1, 2014, Macolor was only paid $1,093 for 35.5 hours of work, or about $223 per month. (*Id.* at ¶ 39-40.)

From December 2013 to March 2014, Defendants repeatedly reminded Macolor that he had to remain available to work for them exclusively or that, under the terms of their employment contract, he would be liable for $20,000. (*Id.* at ¶ 41.) Eventually, Macolor passed the New York State licensing examination for physical therapists and became licensed on February 12, 2014. (*Id.* at ¶ 43.) At about this time, Macolor told Libiran and Urbino that he could not survive in New York on $223 per month, asked Defendants to provide him with full-

4

time employment or provide him with assurances that they would be able to do so. (*Id.* at ¶ 44.) On April 2, 2014, Urbino admitted that Defendants were only able to secure a few days of work for Macolor, and could not assure him that he would soon be employed full-time. (*Id.* at ¶ 45-47.)

Although Libiran and Urbino again threatened to sue Macolor for $20,000 if he sought other employment, Macolor believed he had no choice but to find other work to pay for necessities such as food and housing. (*Id.* at ¶ 48-49.) He therefore sought and obtained work with a different employer. (*Id.* at ¶ 49.) Defendants immediately hired a collection agency that began sending letters to Macolor and calling him at home, demanding payment of $27,729.67. (*Id.* at ¶ 50.) This amount was apparently based on $20,000 in principal, $6,666.66 in collection fees, and $1,063.01 in interest. (*Id.*)

**B.     Inquest Submissions**

In support of inquest damages, Plaintiff filed a Memorandum of Law, a Declaration by Plaintiff's counsel John Howley, a damages calculation, and an invoice of attorneys' hours. (Doc. Nos. 80; 81, Ex.1 and 2; 82.) The Court also reviewed the September 24, 2013 employment contract. (Doc. No. 38, Ex. 4 (*court only*).)

**C.     Procedural Background**

Macolor initiated this action on June 24, 2014. (Doc. No. 1.) After Defendants failed to answer, Macolor moved for default on July 30, 2014. (Doc. No. 7.) Defendants were given until August 20, 2014 to file an opposition to the motion. (Doc. No. 9.) On August 27, 2014, Defendants filed an Answer to the Complaint. (Doc. No. 17.) The Court terminated the Motion for Default Judgment and scheduled an initial conference for September 18, 2014. (Doc. No. 21.) After Defense Counsel's failure to appear at several conferences and other improper behavior

earned him sizeable sanctions, *see Macolor v. Libiran*, 2015 U.S. Dist. LEXIS 34010 (S.D.N.Y., Mar. 18, 2015), the case was temporarily suspended for resolution of bankruptcy proceedings. (Doc. No. 69.) Eventually, trial was set for September 16, 2015. (Doc. No. 71.)

On the eve of trial, Plaintiff's Counsel filed a letter stating that he had reached a settlement agreement with Urbino, but that Defense Counsel had informed him that Libiran was in the Philippines and did not intend to defend against Plaintiff's claims. (Doc. No. 75.) On September 16, 2015, the Court entered a default on consent against Libiran, American Manpower, Axis Point, and American Healthcare. (Doc. No. 74.) The Court then referred the case to the undersigned for calculation of damages. (Doc. No. 75.) On September 24, 2015, Defense Counsel filed an affidavit declaring that he had warned Libiran of the consequences of a default for both Libiran and for the corporations. Libiran was definite about not coming back to New York for the trial, and indicated that he understood the consequences. (Doc. No. 79 at ¶ 3.) On October 5, 2015, Plaintiff moved for default judgment and filed supporting documents on damages with the Court. (Doc. Nos. 81, 82.)

### III. DISCUSSION

**A.     Jurisdiction and Venue**

This Court has subject matter over federal law claims in this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 18 U.S.C. § 1595(a) (civil trafficking), 29 U.S.C. § 216(b) (FLSA), and 15 U.S.C. § 1692k(d) (FDCPA). This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy as the federal law claims. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

### B. Default Judgment and Inquest Standard

The Clerk of Court must enter default against a defendant who has failed to plead or otherwise defend an action, and that failure is shown by affidavit or otherwise. Fed.R.Civ.P. 55(a). Following a default judgment, all well-pled factual allegations of the complaint, except those relating to damages, are accepted as true. *Cotton v. Slone,* 4 F.3d 176, 181 (2d Cir. 1993). A factual allegation will be deemed not well-pled only in "very narrow, exceptional circumstances." *Trans World Airlines, Inc. v. Hughes,* 308 F. Supp. 679, 683 (S.D.N.Y. 1969), *modified,* 449 F.2d 51 (2d Cir. 1971), *rev'd on other grounds,* 409 U.S. 363 (1973).

A court must conduct an inquest in order to determine the amount of damages with reasonable certainty, and it may make such determination without a hearing "as long as it [has] ensured that there is a basis for the damages specified in the default judgment." *TMS Entm't Ltd. v. Madison Green Entm't Sales, Inc.,* 03 Civ. 517(GBD) (RLE), 2005 WL 2063786, at *2 (S.D.N.Y. Aug. 16, 2005) (citing *Transatl. Marine Claims Agency, Inc. v. Ace Shipping Corp.,* 109 F.3d 105, 111 (2d Cir.1997)). Accordingly, the Court may rely on Plaintiff's affidavits and documentary evidence in determining the reasonableness of the damages requested. *See TMS Entm't Ltd.,* 03 Civ. 0517 (GBD) (RLE), 2005 WL 2063786, at *2 (citing *Tamarin v.. Adam Caterers, Inc.,* 13 F.3d 51, 54 (2d Cir.1993)).

### C. Computation of Damages

#### 1. Trafficking Victims Protection Act (TVPA), Common Law Fraud, and Breach of Contract

Plaintiff seeks damages for Defendants' violation of the TVPA, 18 U.S.C. § 1589 *et seq.*, common law fraud, and breach of contract. (Pl.'s Mem. of Law in Support of His Motion for An Award of Damages Against the Defaulted Defendants ("Pl.'s Mem.") at 10.) The TVPA enables individuals who are victims of forced labor or trafficking to file a civil action against the

7

perpetrators in district court. 18 U.S.C. §§ 1589, 1590, 1595. "Forced labor," within the meaning of the statute, includes coercion through abuse or threatened abuse of the law or legal process, or threats of serious financial or reputational harm, such that "a reasonable person of the same background and in the same circumstances" as the victim would be coerced "to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589. Under the statute, "trafficking" includes the knowing recruitment of any person for forced labor. 18 U.S.C. § 1590(a).

Accepting the factual allegations in Macolor's Complaint as true, Defendants are liable to Macolor under the TVPA. Defendants recruited Macolor to travel from the Philippines to work for them in the United States by hosting a recruiting seminar that Macolor attended and then corresponding via email, encouraging Macolor to sign an employment contract that guaranteed him full-time employment. (Compl. ¶ 16, 21-26, 27.) When Macolor arrived in the United States, Defendants failed to provide him with the promised full-time employment. (*Id.* at ¶ 38.) Instead, they gave him only 35.5 hours of work over a four-month period, paying him about $223 for each month. (*Id.* At ¶¶ 39-40.) Despite not earning enough money to support himself in New York City, Macolor was coerced into working for Defendants from December 1, 2013, through March 1, 2014, by Defendants' threats of legal action under the $20,000 liquidated damages clause of the employment contract. (*Id.* at ¶ 41.) Eventually, when Macolor did seek other employment, Defendants hired a collection agency that demanded payment of $27,729.67. (*Id.*) The Court finds that Defendants' threats to make Macolor pay them $20,000 if he sought other employment constituted a serious threat of financial harm that would coerce a reasonable person in Macolor's circumstances to continue providing labor to Defendants to avoid the harm. *See*

18 U.S.C. § 1589. Accordingly, the Court finds that Macolor is entitled to damages under the TVPA.

### a. Calculation of Compensatory Damages

The TVPA authorizes victims of trafficking and forced labor to recover "damages and attorneys' fees" but does not specify how those damages should be measured. *See* 18 U.S.C. § 1595(a). Macolor seeks "the same type of compensatory damages" that would be available for his claims of common law fraud and breach of contract, arguing that the employment contract "provides a legitimate and easily calculable measure of damages." (Pl.'s Mem. at 10.)

In the Second Circuit, "damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract." *Boyce v. Soundview Tech. Group, Inc.,* 464 F.3d 376, 384 (2d Cir. 2006), quoting *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003). Additionally, where the breach of contract was a failure to pay money, the plaintiff is entitled to recover the unpaid amount due under the contract plus interest. *See Scavenger, Inc. v. GT Interactive Software Corp.*, 289 A.D.2d 58, 58-59 (N.Y. App. Div. 2001). The date from which interest is computed is "the earliest ascertainable date the cause of action existed." *Id.* § 5001(b). New York law provides that "interest shall be at the rate of nine per centum per annum, except where otherwise provided by statute." *Id.* § 5004.

Under the terms of the September 24, 2013 employment contract, Defendants promised to pay Macolor $31.15 per hour for full-time work. (Compl. at ¶ 32.) Had Defendants given Macolor full-time work while he was their employee, Macolor would have been paid

9

$21,182.00.[3] The contract also provided that Macolor would receive three days of paid sick leave and six days of paid holidays per year. (*Id.* at ¶ 32.) The *pro rata* value of these benefits for seventeen weeks of employment is $730.15.[4] Defendants paid Macolor only $1,093.05 during this period. (*Id.* at ¶ 39.) Macolor also received $5,000 in exchange for dismissal of his claims against Defendant Urbino. (Doc. No. 73, Ex. 1.) Accordingly, Macolor is entitled to $15,088.95 under the terms of the contract. Because the breach of contract here was a failure to pay money, Macolor is also entitled to prejudgment interest in the amount of nine percent per annum, from the date of the breach to April 11, 2016. *See* N.Y. C.P.L.R. §§ 5001(a)-(b), 5004. The breach occurred on April 2, 2014, when Defendants told Macolor that they could not provide him with full-time work. (Compl. at ¶ 45-47.) Based on that date, Macolor is entitled to $2,756.75 in prejudgment interest, and his total compensatory damages are **$17,845.70**.

### 2. Punitive Damages

Macolor seeks an award of punitive damages, in an amount equal to his compensatory damages, under the TVPA and common law fraud. While the Second Circuit has not yet addressed the issue, other courts have found that punitive damages are available to victims of trafficking under the TVPA. *See Ditullio v. Boehm*, 662 F.3d 1091, 1098 (9th Cir. 2011); *Lagasan v. Al-Ghasel*, 92 F. Supp. 3d 445, 458 (E.D. Va. 2015) (awarding punitive damages where "defendants acted intentionally and maliciously with reckless disregard for plaintiff's health when they trafficked her and forced her to work in terrible conditions for minimal pay, while denying her access to medical care.").

---

[3] Seventeen weeks of employment from December 1, 2013, to April 4, 2014, at forty hours per week, and $31.15 per hour.
[4] Prorated for seventeen weeks of employment, Macolor is entitled to 2.93 days of paid sick and holiday leave, at eight hours per day, and $31.15 per hour.
Plaintiff requested $2,616.60 for paid sick leave and holidays but failed to prorate the amount by his length of employment.

10

In *Ditullo v. Boehm*, the Ninth Circuit analogized the TVPA to the civil rights statute 42 U.S.C. § 1983. 662 F.3d at 1097. In the Supreme Court's § 1983 decisions, the Court "looked to the common law to determine the remedies available under federal statutes creating causes of action sounding in tort." *Id.* at 1097, citing *Barry v. Edmunds*, 116 U.S. 550, 562 (1986); *Smith v. Wade*, 461 U.S. 30 (1983); and *Carey v. Piphus*, 435 U.S. 247, 257-58 (1978). The Ninth Circuit "follow[ed] the 'general rule' that [the court] should award 'any appropriate relief in a cognizable cause of action brought pursuant to a federal statute.'" *Id.* at 1098, citing *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 71 (1992). The court held that punitive damages are available under the TVPA because the statute "creates a cause of action that sounds in tort and punitive damages are available in tort actions under the common law." 662 F.3d at 1094. The Court finds the reasoning of *Ditullo* persuasive, and agrees that punitive damages may be awarded in a claim brought under the TVPA.

Having determined that punitive damages are available, the Court turns now to the justification for such an award in this case. Macolor argues that the facts in the Complaint are sufficient to support an award of punitive damages because the facts support a cognizable claim of common law fraud. Applying New York law on common law fraud, the Court concludes otherwise.

Under New York law, punitive damages are allowed "where the defendant's conduct evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations." *Evans v. Ottimo*, 469 F.3d 278, 283 (2d Cir. 2006), citing *Walker v. Sheldon*, 10 N.Y.2d 401, 405 (1961) (internal quotations omitted). They are not available "in the ordinary fraud and deceit case." *Kelly v. Defoe Corp.*, 223 A.D.2d 529, 529 (N.Y. App. Div. 2d Dep't 1995), citing *Walker*, 10 N.Y.2d at 405 (internal quotations omitted).

11

In *Kelly*, the Appellate Division struck a claim for punitive damages by a plaintiff who claimed that the defendants "made fraudulent misrepresentations which induced her to accept employment" with them but the record "was devoid of any indication that the alleged misrepresentations were aimed at the public," or that any member of the public relied on the misrepresentations, or that the defendants' misrepresentations "caused injury to any individual other than the plaintiff." 223 A.D.2d at 529.

The record here contains some facts that suggest the existence of a scheme directed to defraud the public generally. Macolor first became acquainted with Defendants when he attended a recruitment seminar at a shopping mall in Manila entitled "Work in America: Learn the Success Formula (PT Version)," from which it is possible to infer that others were recruited to work under similar circumstances. (Compl. at ¶ 16.) Macolor, however, has not alleged that any other individuals were promised full-time employment, travelled to the United States in reliance on those promises, were not provided with full-time employment, and were subjected to threats of litigation if they sought other employment. Macolor argues that punitive damages are justified because Defendants "knowingly and intentionally used the threat of a lawsuit and collection efforts to extort money and/or labor out of plaintiff." (Pl.'s Mem. At 13.) Even knowing and intentional fraud, however, does not rise to the level of "wanton dishonesty as to imply a criminal indifference to civil obligations." *See Evans*, 469 F.3d at 283. The Court finds that this case is more analogous to "ordinary fraud and deceit," and that punitive damages are not available under the common law of the State of New York. Accordingly, Macolor's request for punitive damages should be **DENIED**.

### 3. Attorneys' Fees and Costs

Macolor seeks attorneys' fees in the amount of $54,900[5] and costs in the amount of $3,351.96. The TVPA provides that an individual who is a victim of forced labor may recover reasonable attorneys' fees. 18 U.S.C. § 1595(a). Because Macolor is entitled to relief under the TVPA, an award of reasonable attorneys' fees is proper.

In determining the appropriate amount of attorneys' fees to award, the Court must calculate the "presumptively reasonable fee" by multiplying a reasonable hourly rate by the reasonable number of hours worked. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 493 F.3d 110, 117-18 (2d Cir. 2007), *amended on other grounds*, 522 F.3d 182 (2d Cir. 2008). A "reasonable hourly rate is the rate a paying client would be willing to pay." *McDaniel v. County of Schnectady*, 595 F.3d 411, 414 (2d Cir. 2010). The factors relevant to this determination include: "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Arbor Hill*, 493 F.3d at 114 n.3 (internal quotation marks omitted). Furthermore, this Circuit has affirmed the "forum rule," whereby a district court will award fees at the going rate in the district in which the court sits. *Simmons*, 575 F.3d at 174. The burden is on the party

---

[5] Plaintiff's brief requests $58,251.96 in fees, but this number appears to incorrectly include costs. The invoice reflects $54,900 in billed services. (Doc. No. 81, Ex. 2.)

seeking attorneys' fees to submit sufficient evidence to support the hours worked and the rates claimed. *See Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).

In the Second Circuit, a party seeking an award of attorneys' fees must support its application by submitting time records that detail "for each attorney, the date, hours expended, and the nature of the work done." *N.Y. State Assoc. for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1154 (2d Cir. 1983). When determining the reasonableness of the hours expended by counsel, the Court considers "the value of the work product of the specific expenditures to the client's case." *Luciano v. Olsten Corp.,* 109 F.3d 111, 116 (2d Cir. 1997) (citations omitted). Moreover, the Court should reduce the lodestar calculation by any amount of time it deems unreasonable. *See Quarantino v. Tiffany & Co.,* 166 F.3d 422, 425 (2d Cir. 1998) (citing *Hensley v. Eckerhart,* 461 U.S. 424, 434 (1983)).

### 1. Counsel's Hourly Rates

Macolor requests an award of fees based on a rate of $500 per hour for his attorney, John Howley, a solo practitioner with twenty-five years of experience litigating labor and employment cases, as well as cases under the TVPA. (Doc. No. 81 ("Decl. of John Howley").) This rate is reasonable based on counsel's practice as well as his credentials and years of experience. In determining whether a fee is reasonable, "the court may consider rates approved in prior cases and the court's own knowledge of reasonable rates in the district." *Galeana v. Lemongrass on Broadway Corp.*, No. 10-CV-7270 (GBD) (MHD), 2014 WL 1364493, at *13 (S.D.N.Y. Apr. 4, 2014) (citing *Farbotko v. Clinton Cnty.*, 433 F.3d 204, 209 (2d Cir. 2005)). Because an attorney's status as a solo practitioner is not grounds for a reduction in the reasonable hourly rate, the Court looks to rates charged by attorneys with comparable years of experience in the New York City market to determine whether Howley's requested rate is reasonable. *McDonald*

*ex rel Prendergast v. Pension Plan of the NYSA-ILA Pension Trust Fund*, 450 F.3d 91, 98 n.6 (2d Cir. 2006). The Court may further rely on its own knowledge of private firm hourly rates in the community and is not restricted to the hourly rate data submitted into evidence. *Miele v. New York State Teamsters Conference Pension & Ret. Fund*, 831 F.2d 407, 409 (2d Cir. 1987). Although on the high end of the scale, Howley's rate is in line with rates that have been approved and awarded in this District.[6]

### 2. Hours Expended by Counsel

Macolor requests an award of fees based on records indicating that a total of 109.8 hours were expended on this case. A review of counsel's contemporaneous billing records indicates that the hours expended in reaching default judgment were reasonable. This case was litigated up until the eve of trial, when Defendants' counsel informed the Court that his client would not be appearing. (Doc. No. 74.) Moreover, throughout the litigation defense counsel repeatedly engaged in dilatory tactics, and, as a result, was subjected to sanctions by District Judge Furman on several occasions (*See* Doc. Nos. 36, 48, 49.) Howley's billing records reflect reasonable time expended conducting discovery and preparing for trial, as well as drafting motions for sanctions against Defendants. (Doc. No. 81, Ex. 2.) Accordingly, I recommend that Macolor be awarded fees of **$54,900.00**.

---

[6] *See, e.g., Lora v. J.V. Car Wash, Ltd.*, 11 Civ. 9010 (LLS) (AJP), 2015 U.S. Dist. LEXIS 99444, *20 (S.D.N.Y. July 24, 2015) ("recent decisions in this Circuit approve hourly rates of $500 or more for experienced employment litigators"); *Coakley v. Webb*, 14 Civ. 8438 (ER), 2016 U.S. Dist. LEXIS 30780, *17 (S.D.N.Y. Mar. 9, 2016) (hourly rate of $575 was reasonable for a solo practitioner with 30-years of experience in civil rights actions); *Mazzei v. Money Store*, 01 Civ. 594 (JGK) (RLE), 2015 U.S. Dist. LEXIS 59397, *6 (S.D.N.Y. May 6, 2015) ($425 was reasonable for a class counsel with 25 years of experience); *Spencer v. City of New York*, 06 Civ. 2852 (KMW), 2013 U.S. Dist. LEXIS 161693, *15 (S.D.N.Y. Nov. 12, 2013) ($400 was a reasonable hourly rate for the named partner, with twenty-eight years of experience, at a small civil rights firm); *Kadden v. VisuaLex, LLC*, 11 Civ. 4892 (SAS), 2012 U.S. Dist. LEXIS 173922 (S.D.N.Y. Dec. 6, 2012) (holding "an hourly fee of $375 is reasonable" for "a well-respected solo practitioner with approximately twenty-five years of legal experience").

### 3. Plaintiff's Requested Costs

Counsel incurred **$3,351.96** in costs and expenses for photocopies, PACER fees, postage, travel, court reporter and transcription services, process serving, and filing fees. (Doc. No. 81, Ex. 2.) Having reviewed the invoices provided and incorporated by reference into Howley's sworn declaration, (Doc. No. 81 at ¶ 17), the Court finds that counsel reasonably incurred these expenses.

## IV. CONCLUSION

For the reasons stated above, I recommend that the Court award Macolor damages and prejudgment interest in the amount of **$15,088.95 in damages and $58,251.96 in attorneys' fees and costs, and $2,756.75 in prejudgment interest, for a total of $76,097.66.**

Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Jesse M. Furman, 40 Foley, Room 2202, New York, New York 10007, and to the chambers of the undersigned, 500 Pearl Street, Room 1970, New York, New York 10007. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn,* 474 U.S. 140, 150 (1985); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1) (West Supp. 1995); Fed. R. Civ. P. 72, 6(a), 6(d).

**DATED: March 25, 2016**
**New York, New York**

*[signature]*
**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**

16